UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Tom Cossette

   v.                                        Civil No. 06-cv-347-JD

Angela Poulin, et al.[1]

**O R D E R**

Tom Cossette, a New Hampshire state prisoner proceeding pro se and in forma pauperis, has filed a complaint pursuant to 42 U.S.C. § 1983 alleging that the defendants to this action, employees of the New Hampshire Department of Corrections, have retaliated against him for exercising his First Amendment rights. The matter is before me for preliminary review to determine whether or not the complaint states a claim upon which relief might be granted. United States District Court for the District of New Hampshire Local Rule ("LR") 4.3(d)(2). For the reasons stated herein, I find that the complaint does state a claim upon

---

[1]Cossette names the following defendants to this action: Angela Poulin, Media Specialist, Northern New Hampshire Correctional Facility ("NCF"), NCF Major Dennis Cox, and Greg Crompton, Deputy Warden, New Hampshire State Prison.

which relief might be granted and I direct that it be served on the defendants.

## Standard of Review

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the magistrate judge is directed to conduct a preliminary review and to prepare a report and recommendation determining whether the complaint or any portion thereof should be dismissed because:

> (i) the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2). In conducting the preliminary review, the Court construes pro se pleadings liberally. See Ayala Serrano v. Lebron Gonzales, 909 F.2d 8, 15 (1st Cir. 1990) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976) to construe pro se pleadings liberally in favor of the pro se party). "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." Ahmed

v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997), cert. denied, Ahmed v. Greenwood, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions made by the plaintiff and inferences reasonably drawn therefrom must be accepted as true. See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not bald assertions, must be accepted as true). This review ensures that pro se pleadings are given fair and meaningful consideration. See Eveland v. Dir. of C.I.A., 843 F.2d 46, 49 (1st Cir. 1988).

## Background

In June of 2005, Tom Cossette held a prison job at NCF as a clerk in the law library. His supervisor was the NCF Media Generalist, defendant Angela Poulin. During Cossette's employ at the library, he received written performance evaluations on July 25, 2005, October 24, 2005 and January 27, 2006.[2] Cossette's performance was scored, on those three evaluations, as between 37

---

[2]The evaluations are attached to the complaint and are therefore considered a part of the complaint for all purposes. See Fed. R. Civ. P. 10(c) (requiring that written instruments attached to a pleading be construed as part of the pleading "for all purposes").

and 44 points out of a possible 48 points.  He received an "A" grade on the July and October evaluations, and a "B" grade on the January evaluation.

In March of 2006, as part of his library job, Cossette was present when another inmate, Allen Belton, submitted a request for photocopies to Poulin.  Cossette noticed that when Poulin made the copies, she made a mistake, resulting in the printing of more copies than Belton had requested.  Poulin charged Belton's inmate account for the extra copies.  Belton, in anticipation of filing a lawsuit regarding the misappropriation of his money by Poulin, requested that Cossette write a statement attesting to the fact that Belton's request for copies had been filled out and submitted correctly.  Cossette obliged and wrote a statement for Belton dated March 6, 2006.  The statement did not mention Poulin, and only stated that Belton had followed correct procedures in making his request, to the best of Cossette's knowledge.

On March 23, 2006, Belton submitted his pleading, which included Cossette's statement, to Poulin to be copied.  Poulin read the submission prior to copying it and saw Cossette's statement.  Poulin then called Cossette into her office and

directed him to recant his statement.  Poulin told Cossette that as a library clerk, he could not write statements for inmate lawsuits about what occurred while Cossette was working.

Cossette refused to recant his statement and told Poulin that he believed he had a right to make such a statement under the First Amendment.  Poulin told Cossette that he was "adding fuel to the fire" regarding the dispute with Belton.  Poulin then terminated Cossette's position as a law clerk because he refused to withdraw his written statement from Belton's filing.  On April 10, 2006, Poulin requested in writing that Cossette be placed on "No Job Status."  Her stated reason was that his job as a library clerk was "not working out."  This resulted in a loss of income to Cossette, who was making $40-$45 per month as a library clerk.  On "No Job Status," Cossette could earn only $17 per month, roughly one-third of his salary at the prison library job.

On April 12, 2006, Cossette filed a grievance with his unit manager, Robert Thyng.  Thyng responded that Cossette had been fired after "several verbal warnings for work performance," and not as a result of the statement he gave to Belton.  Cossette alleges that he was never given verbal warnings aside from Poulin's admonitions regarding the statement he gave to Belton.

On April 28, 2006, Cossette appealed his grievance to the NCF warden.  On May 1, 2006, Major Cox responded to the grievance on behalf of the Warden, stating that a "staff member may fire any inmate at anytime for any reason."  Cossette appealed that grievance to the Commissioner of the New Hampshire Department of Corrections on May 29, 2006.  On June 2, 2006, Greg Crompton responded for the Commissioner, denying the grievance because "[i]nmates do not have rights to jobs."  Having fully and properly exhausted his administrative remedies, Cossette filed suit in this Court alleging that his employment was terminated in retaliation for his exercise of his First Amendment rights.

Discussion

1.   Retaliation

Ordinarily, a prison inmate has no right to hold or maintain a prison job.  See Dupont v. Saunders, 800 F.2d 8, 10 (1st Cir. 1986) ("unless state laws or regulations are to the contrary, prisoners have no vested property or liberty rights to either obtain or maintain prison jobs").  However, an inmate may not be fired from a prison job in retaliation for an exercise of his constitutionally protected rights.  Beauchamp v. Murphy, 37 F.3d 700, 710 (1st Cir. 1994), cert. denied, 514 U.S. 1019 (1995); see

also <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3d Cir. 2003) ("[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.").

Prison officials may make policy that is reasonably related to legitimate penological interests, even at the expense of certain constitutional rights. <u>See</u> <u>Beard v. Banks</u>, ___ U.S. ___, 126 S.Ct. 2572, 2579 (2006) (citing <u>Turner v. Safley</u>, 482 U.S. 78, 89-90 (1987)). However, "actions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms." <u>Ferranti v. Moran</u>, 618 F.2d 888, 892 n.4 (1st Cir. 1980) (citing <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979)); <u>see</u> <u>also</u> <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993), <u>cert.</u> <u>denied</u>, 512 U.S. 1209 (1994) (prison officials cannot lawfully impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right). In order to state a claim for retaliation for an exercise of his First Amendment rights, an inmate must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the

hands of the prison officials, and (3) a causal link between the exercise of the inmate's First Amendment rights and the adverse action. Price v. Wall, 428 F. Supp. 2d 52, 55 (D.R.I. 2006); see also LaFauci v. N.H. Dep't of Corr., 2005 WL 419691, *7 (D.N.H.) (Unpublished Order).

    A.    Conduct Protected by the First Amendment

        i.    Free Speech

The First Amendment protects an individual's right to speak freely. See U.S. Const. amend. I.[3] Part of the free speech right of ordinary individuals is the right to testify truthfully. See Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988) (prisoner stated valid § 1983 claim for retaliation by alleging that prison officials filed false charges against him in retaliation for exercising his right to testify); see also Melton v. City of Oklahoma City, 879 F.2d 706, 714 (10th Cir. 1989) (the right to appear and give true testimony as a witness in a legal proceeding is guaranteed by the First Amendment's free speech clause), cert. denied, 502 U.S. 906 (1991); Langley v. Adams County, 987 F.2d

---

[3]U.S. Const. amend. I states in relevant part:

> Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

1473, 1479 (10th Cir. 1993) (the right to testify truthfully is protected by the First Amendment); Reeves v. Claiborne County Bd. of Educ., 828 F.2d 1096, 1100 (5th Cir. 1987) (same) (quoting Smith v. Hightower, 693 F.2d 359, 268 (5th Cir. 1982)).

A prisoner's oral and written complaints about the misconduct of his prison employer is also protected free speech under the First Amendment. King v. Ditter, 432 F. Supp. 2d 813, 818–19 (W.D.Wis. 2006) (following Sasnett v. Litscher, 197 F.3d 290, 292 (7th Cir. 1999) in imputing to prisoners employed by the prison the First Amendment right of public employees to speak freely about matters of public concern).[4]  A written statement

---

[4] Most of the caselaw regarding retaliation for the exercise of free speech appears in the public employment context. See Thaddeus-X v. Blatter, 175 F.3d 378, 388 (6th Cir. 1999). While at least one Circuit has imputed the free speech rights of public employees to prisoners, see Sasnett, 197 F.3d at 292, it has done so with an eye toward the Supreme Court's requirement that the right of public employees to speak freely on matters of public concern be balanced against the need of the employer to promote the efficiency of the public service it performs through its employees. Waters v. Churchill, 511 U.S. 661, 681–82 (1994) (applying balancing test outlined in Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).  The Sixth Circuit, however, has found that in the prisoner context, when balancing the need to protect the First Amendment rights of prisoners with the potential disruptive impact of free speech on a prison, a court must consider the specific needs of the parties in their particular context, including protecting the right of the individual and the permissibility of speech-limiting regulations in prison that are reasonably related to a legitimate penological interest. Thaddeus-X, 175 F.3d at 389.

provided to another inmate in support of the second inmate's litigation against the prison has been held to be a form of free speech protected by the First Amendment.  See Zarska v. Higgins, 171 Fed. Appx. 255, 257, 259 (10th Cir. 2006); see also Jefferson v. Wolfe, Civ. Action No. 04-44, 2006 WL 1947721, *12 (W.D.Pa. July 11, 2006) (writing poetry for dissemination within prison that was critical of legal system is a form of free speech protected by the First Amendment and therefore inmate cannot be fired from prison job in retaliation for the writings).

       ii.   Petitioning the Government for Redress of Grievances/Maintaining Right of Access to the Courts

The right to petition the government for a redress of grievances has been characterized as "among the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967). This right, in the prison context, means that inmates must be "permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers." Sostre v. McGinnis, 442 F.2d 178, 200 (2d Cir. 1971) (en banc), cert. denied, Sostre v. Oswald, 404 U.S. 1049 & Oswald v. Sostre, 405

U.S. 978 (1972). The First Amendment protects an individual's freedom of speech in both oral and written form. See U.S. Const. amend. I; Palmigiano v. Travisono, 317 F. Supp. 776, 786 (D.R.I. 1970) (recognizing that the First Amendment's protection extends to written correspondence to public officials seeking to redress grievances or protest injustices).

Under the Due Process Clause of the Fourteenth Amendment, prison inmates enjoy a right of access to the courts. See Bounds v. Smith, 430 U.S. 817, 828 (1977)[5]; Lewis v. Casey, 518 U.S. 343, 350-51 (1996). States have an affirmative duty to ensure that inmates have meaningful access to the courts. Id. at 832-34; Wolff v. McDonnell, 418 U.S. 539 (1974), Johnson v. Avery, 393 U.S. 483 (1969); Germany v. Vance, 868 F.2d 9, 14 (1st Cir.

---

[5]The right of access to the Courts in the prisoner context has been limited to certain types of lawsuits. See Thaddeus-X, 175 F.3d at 391 (limiting a prisoner's right to access the courts to direct appeals, habeas petitions, and civil rights claims taken on prisoner's own behalf). Here, however, I find that the lawsuit filed by Belton can sufficiently allege unconstitutional conditions of confinement that Belton's right of access to the courts to litigate such a suit includes Cossette's right to participate therein. See Johnson v. Avery, 393 U.S. 483, 490 (1969) (plaintiff prisoner has standing to press claim under § 1983 for interference with plaintiff's right to assist another inmate in effecting the other inmate's right to petition for the redress of grievances); McDonald v. Hall, 610 F.2d 16, 19 (1st Cir. 1979) (same); Haymes v. Montanye, 547 F.2d 188, 191 (2d Cir. 1976) (same), cert. denied, 431 U.S. 967 (1977).

1989) (internal quotations omitted).  A prisoner's right to access the courts has been held to encompass the right to testify as a non-party witness in a lawsuit.  Gay v. Shannon, No. Civ.A. 02-4693, 2005 WL 756731, *8 (E.D.Pa. Mar. 1, 2005) ("[The Third Circuit] has recognized the right [to testify as a non-party witness] exists for members of the general population and it should be extended to an inmate unless his confinement requires otherwise.") (citing Green v. Phila. Hous. Auth., 105 F.3d 881, 886 (3d Cir. 1997), Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000), and Smith v. Hightower, 693 F.2d 359, 368 (5th Cir. 1982) for the proposition that the First Amendment protects a non-party witness' right to testify truthfully at trial).

    iii. Violations of Cossette's First Amendment Rights

Cossette has alleged that he exercised his First Amendment free speech right and right to petition the government for a redress of grievances by making and providing another inmate with a written statement expressing his truthful view of a situation. That statement was intended for use in civil rights litigation. I find that Cossette has sufficiently alleged that his written statement was speech entitled to the protection of the First Amendment, and that it was also a petition to the government to

redress grievances protected by the First Amendment. Accordingly, I find that Cossette has alleged a First Amendment right sufficient to meet the first requirement for stating a retaliation claim.

    B.   <u>Adverse Action</u>

To state an adverse action, plaintiff must allege that the defendants subjected him to "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her Constitutional rights." <u>Dawes v. Walker</u>, 239 F.3d 489, 492 (2d Cir. 2001), <u>overruled in part on other grounds by</u> <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 187 n.6 (2d Cir. 2002); <u>see</u> <u>Thaddeus-X</u>, 175 F.3d at 398. Termination of a prisoner's employment for the exercise of First Amendment rights constitutes an adverse action for purposes of claims of retaliation. <u>King</u>, 432 F. Supp. 2d at 817-18. Even if an inmate is not chilled in his expression, he may still state a claim for retaliation if it is arguable that the retaliatory behavior alleged is sufficient and of the type to deter an ordinary person from exercising his rights. <u>Gay</u>, 2005 WL 756731, *8 (citing <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000)).

Of course, prison administrators may make rules and regulations that curtail the constitutional rights of inmates if those rules are reasonably related to legitimate penological interests. <u>Turner</u>, 482 U.S. at 89.  The same reasoning has been applied to actions taken by prison officials that curtail constitutional rights, such as job termination.  <u>See</u> <u>Beauchamp</u>, 37 F.3d at 711.  Here, Poulin indicated only that law clerks were prohibited from making any statements regarding events that occurred in the library while they were working and that in particular, Cossette's statement "added fuel to the fire" regarding Belton's complaints.  Under such a broadly stated rule, Cossette's statement, that Belton had correctly filled out his request, would be disallowed.  However, there is nothing on the face of the regulation to indicate that it is intended to support legitimate penological objectives.  To the contrary, in this case the regulation is alleged to have been utilized to provide a cover for a librarian who makes mistakes or otherwise harms inmates in the presence of her law clerks.

Cossette has alleged that as a result of the exercise of his First Amendment rights, he was terminated from a prison job, and that as a result, his monthly income was reduced to one third of

what he was paid as a library clerk.  It is entirely plausible that the prospect of losing the privileges and income associated with a job as a law library clerk might cause an inmate of ordinary firmness to recant a truthful statement or decline to make such a statement in the first place in order to keep his job.  Cossette has therefore stated sufficient facts to allege that an adverse action was taken against him, that was not an action taken in pursuit of any legitimate penological objective, for the exercise of his First Amendment rights.

    C.    <u>Retaliatory Action Caused by First Amendment Violation</u>

Circumstantial evidence is often enough to support a claim that an adverse action was taken with retaliatory intent, as intentions are often difficult to prove through direct evidence. <u>Beauchamp</u>, 37 F.3d at 711; <u>Ferranti</u>, 618 F.2d at 892 (chronology of events provided support for inference of retaliation), <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979) (same); <u>see also</u> <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995), <u>cert. denied</u>, <u>Palermo v. Woods</u>, 516 U.S. 1084 (1996).  Here, Cossette alleges that during his conversation with Poulin, he was specifically told that if he did not recant his statement to Belton regarding library procedures, a statement which Poulin

perceived as contrary to her legal interests, he would be terminated from his job.  Cossette refused to recant his statement and was, shortly thereafter, terminated from his job. This sequence of events presents sufficient evidence of an adverse act specifically taken in response to Cossette's exercise of his First Amendment rights to meet the third requirement for a retaliation claim to allow that claim to proceed against Poulin.

2.   Supervisory Liability Claims

"Supervisory liability under § 1983 cannot be predicated on a respondeat [superior] theory, but only on the basis of the supervisor's own acts or omissions."  Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998) (internal citations omitted).  A supervisor, to be liable for the acts of those who serve underneath him, must be "either was a primary actor involved in, or a prime mover behind, the underlying violation." Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999). There must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" to the violation alleged.  Id. at 44.

Cossette has named Cox and Crompton as defendants to this action in their supervisory capacities.  Cossette alleges that

Cox and Crompton are responsible for the constitutional violation alleged because when, through his grievances, they became aware of the situation, they failed to remedy it or to protect Cossette's constitutional rights.  Instead, both Cox and Crompton implicitly approved and supported Poulin's actions.  Cossette therefore has sufficiently alleged that both Cox and Crompton were responsible for the retaliation alleged, and I will direct that the claims in this case be served against both Cox and Crompton in their supervisory capacities.

## Conclusion

As I find that plaintiff has stated a claim upon which relief may be granted, I order the complaint (document no. 1) be served on Defendants.  The Clerk's office is directed to serve the New Hampshire Office of the Attorney General (AG), as provided in the Agreement On Acceptance Of Service, copies of this order and the complaint (document no. 1).  See LR 4.3(d)(2)(C).  Within thirty days from receipt of these materials, the AG will submit to the court an Acceptance of Service notice specifying those defendants who have authorized the AG's office to receive service on their behalf.  When the

Acceptance of Service is filed, service will be deemed made on the last day of the thirty-day period.

As to those defendants who do not authorize the AG's office to receive service on their behalf or whom the AG declines to represent, the AG shall, within thirty days from receipt of the aforementioned materials, provide a separate list of the last known addresses of such defendants. The Clerk's office is instructed to complete service on these individuals by sending to them, by certified mail, return receipt requested, copies of these same documents.

Defendants are instructed to answer or otherwise plead within twenty days of acceptance of service. See Fed. R. Civ. P. 12(a)(1)(A).

Plaintiff is instructed that all future pleadings, written motions, notices, or similar papers shall be served directly on the Defendants by delivering or mailing the materials to them or their attorneys, pursuant to Fed. R. Civ. P. 5(b).

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date:     December 18, 2006
cc:       Tom Cossette, pro se