UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Tom Cossette

     v.                         Civil No. 06-cv-347-JL
                                    Opinion No. 2008 DNH 162
Angela Poulin,
Dennis Cox, and
Greg Crompton

# **O R D E R**

Plaintiff pro se Tom Cossette, an inmate at the Northern Correctional Facility, claims that the defendants retaliated against him for exercising his First Amendment rights.  Cossette alleges that he was removed from his job as a clerk in the prison law library in retribution for giving a written statement to another inmate in support of his planned lawsuit challenging an action taken by the prison librarian, defendant Angela Poulin. Poulin and her co-defendants, who are a major and the former warden at the facility, have moved for summary judgment.

This court has jurisdiction over this matter under 28 U.S.C. § 1332 (federal question), and heard oral argument on this motion, in which Cossette participated by videophone, on August 26, 2008.  Based on the parties' arguments there and in their briefing, including the supplemental memoranda filed in response

to this court's prior order, the court grants the defendants' motion for summary judgment.


I.    **<u>Applicable Legal Standard</u>**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  <u>Mulvihill v. Top-Flite Golf Co.</u>, 335 F.3d 15, 19 (1st Cir. 2003).  The following background facts are set forth in accordance with this standard.


II.  **<u>Background</u>**

Beginning in June 2005, Cossette worked for Poulin as a clerk in the prison law library, which, among other resources, offers computers that inmates may use to perform legal research. As an inmate law clerk, Cossette was responsible for assisting other inmates with their research, but was not permitted to do that research on their behalf.  As compensation, he received $1.50 in wages each weekday--sixty-five cents more than the

eighty-five cents in daily allowance given to inmates who do not work--plus up to an additional one dollar bonus each day at Poulin's discretion.  During the first several months of Cossette's employment, Poulin reprimanded him on multiple occasions for socializing with or performing research for other inmates while they were in the library, in violation of prison policies.  Cossette, however, says that in each instance he was able to provide a satisfactory explanation for his behavior.

In early December 2005, Poulin spoke to Cossette and another inmate, Allen Belton, several times for "talking too much" in the library, though Cossette, again, says that he explained on each occasion that he was simply answering Belton's research questions.  It was around this time, Poulin recalls, that she sensed that a group of inmates, including Belton and, ultimately, Cossette, were beginning to defy her authority openly.

Cossette attests that, in March 2006, he noticed that Poulin had overcharged Belton for a "copy/printout request" by producing more copies than he had asked for.  Poulin, for her part, recalls that Belton had instructed the legal research software on one of the library computers to print some 268 pages of material in a large font, and that Poulin had simply counted the pages and charged Belton's inmate account accordingly.

In any event, Belton became angry about the charges, claiming that "the computer had made a mistake."  He also asked Cossette to write a statement for Belton to use "as a basis for [Cossette's] testimony in legal proceedings to recoup the overcharged amount."  So Cossette wrote the following:

> I Thomas P. Cossette state that I was present when Allen Belton sent the document he was working on to print and to the best of my knowledge correctly followed all print procedures.

Cossette signed the statement and dated it March 6, 2006.

What happened next is a matter of considerable disagreement. Poulin, who says the printing charge dispute actually did not occur until March 23, says that during her discussion with Belton on that day, Cossette "became increasingly confrontational and argumentative" toward her, making her feel unsafe.  Poulin adds that, a few days later, she noticed Cossette talking to Belton and another inmate who were upset that the library had opened forty minutes later than usual.  Because she perceived that Cossette "was feeding into the complaints and anger some of these inmates had toward the library" and herself, Poulin explains, she warned Cossette "not to feed into other inmates' issues."  Poulin denies that this comment was intended to refer to the written statement Cossette had given Belton.

Cossette, however, says that, in late March, Poulin came upon the written statement in a packet of "legal material concerning the overcharging" Belton had submitted for photocopying.  Cossette alleges that Poulin then called him into her office, instructed him that "as a clerk [he] was not able to write statements for other inmates about what happens during [his] employment," and ordered him "to recant the statement." Cossette says that when he refused, invoking his "right to submit a statement," Poulin, who was "extremely upset," ordered him out of her office.  It was during this exchange, Cossette maintains, that Poulin upbraided him for "adding fuel to the fire" of other inmates' gripes about her and the library.

Cossette continued working in the library until April 10, when Poulin informed him that he would be transferred to another job within the prison.  The parties also dispute what happened during this exchange.  Poulin says she explained to Cossette that she "had to warn him too many times about chatting and doing things for other inmates," characterizing the incident of March 23, "when Cossette became argumentative and confrontational," as "the final straw."  Cossette, however, says that Poulin told him, "although there had been minor issues of chatting while in the law library, the final straw was the statement" he had written

for Belton, which, according to Cossette, Poulin described as "the deciding factor" in her choice to transfer him.

The parties agree that, to accomplish the transfer, Poulin placed Cossette on "no job available" status, rather than "reduced pay status," which the defendants describe as the equivalent of a termination for cause within the prison employment system:  while an inmate on reduced pay status cannot apply for another job for ninety days, an inmate on no job available status can.  Cossette, in fact, began another job elsewhere in the prison on June 16, for a daily wage of one dollar, and by November 1 was earning $1.50 per day, plus up to one dollar each day in bonuses, just as he had working for Poulin.  And Cossette had continued earning his wages as a library clerk until April 27, when his "no job available" status became effective.

Nevertheless, Cossette immediately challenged the transfer through the prison's inmate grievance process, where it was affirmed by defendants Cox and Crompton.  Having thus exhausted his administrative remedies, see 42 U.S.C. § 1997e(a), Cossette commenced the instant suit, alleging that Poulin transferred him in retaliation for exercising his rights under the First Amendment and that Cox and Crompton had condoned that action by rejecting the grievances.

6

III. **<u>Analysis</u>**

Because "constitutional violations may arise from the deterrent, or chilling, effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights, . . . the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." <u>Bd. of County Comm'rs v. Umbehr</u>, 518 U.S. 668, 647 (internal citations, quotation marks, and alterations omitted).  So, even though an inmate generally has no "constitutional right to . . . a particular job assignment, prison officials must not . . . deny him a job assignment in retaliation for the exercise of a constitutionally protected activity."  <u>Beauchamp v. Murphy</u>, 37 F.3d 700, 710 (1st Cir. 1994) (Bownes, J., dissenting); <u>see also</u>, <u>e.g.</u>, <u>Dupont v. Saunders</u>, 800 F.2d 8, 10-11 (1st Cir. 1986); <u>Hoskins v. Lenear</u>, 395 F.3d 372, 375 (7th Cir. 2005); <u>Vignolo v. Miller</u>, 120 F.3d 1075, 1077-78 (9th Cir. 1997).

To prevail on a retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech

and the adverse action."[1] <u>Davis v. Goord</u>, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); <u>see also</u> <u>Smith v. Mosley</u>, 532 F.3d 1270, 1276 (11th Cir. 2008); <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001); <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc); <u>Starr v. Dube</u>, 2007 DNH 153, 8.  If the plaintiff succeeds in this showing, the burden shifts to the defendant to prove, by a preponderance of the evidence, that it would have taken the allegedly retaliatory action even in the absence of the protected conduct.  <u>See</u> <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979) (citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274 (1977)); <u>see also</u> <u>Starr</u>, 2007 DNH 153, 8.

In moving for summary judgment, the defendants argue, among other things, that (1) Cossette did not engage in protected speech by providing Belton with the written statement, because, in doing so, Cossette was acting as a prison employee rather than a private citizen, and, furthermore, he was not speaking on a matter of public concern, (2) that Cossette's transfer from the library job was not sufficiently adverse as a matter of law to constitute retaliation, (3) that the transfer would have occurred

---

[1]These are the same basic elements a public employee must show to succeed on a claim arising out of retaliatory job action for exercising his First Amendment rights.  <u>See</u> <u>Gagliardi v. Sullivan</u>, 513 F.3d 301, 306 (1st Cir. 2008).

regardless of whether Cossette had given the statement to Belton,
given Poulin's ever-increasing concerns about Cossette's job
performance, and (4) the defendants are protected by qualified
immunity in any event.  Because the court concludes that the
defendants are entitled to summary judgment on the first ground,
it does not reach their other arguments.

While "[a] state cannot condition public employment on a
basis that infringes the employee's constitutionally protected
interest in freedom of expression," that protection extends only
to expression "fairly considered as relating to any matter of
political, social, or other concern to the community."  Connick
v. Myers, 461 U.S. 138, 146 (1983).  A public employee, then,
"has no First Amendment cause of action based on his or her
employer's reaction to the speech" unless "the employee spoke as
a citizen on a matter of public concern."  Garcetti v. Ceballos,
547 U.S. 410, 418 (2006).[2]  Whether an employee's speech fits

---

[2]Poulin also argues that Cossette was not speaking "as a
citizen" in composing the statement for Belton, because it
"related to an incident involving his duties as a law library
clerk."  The fact that speech "concerned the subject matter of
[the plaintiff's] employment," however, does not itself mean that
the plaintiff was speaking as a public employee, rather than as a
citizen.  Garcetti, 547 U.S. at 421.  Instead, that distinction
turns on whether the employee's "expressions were made pursuant
to his duties."  Id.  There is no evidence here that Cossette's
duties as a clerk included the reporting of goings-on in the
library; in fact, Cossette alleges that Poulin told him he was
prohibited from doing so.

this characterization presents a question a law for the court to decide.  See Connick, 461 U.S. at 148 n.7.

Applying these principles, a number of courts have refused to recognize inmates' claims of retaliation for speech that was not on a matter of public concern, at least where the retaliation took the form of adverse action against the inmate's prison job. See, e.g., Robinson v. Boyd, No. 06-15709, 2008 WL 1838656, at *1 (11th Cir. Apr. 25, 2008) (unpublished disposition), petition for cert. filed, No. 08-5424 (U.S. July 18, 2008); McElroy v. Lopac, 403 F.3d 855, 858-59 (7th Cir. 2005); Chambers v. Adams, 230 F.3d 1357 (table), 2000 WL 1459836, at *1-*2 (6th Cir. 2000) (unpublished disposition); Ruiz v. Cal. Dep't of Corrs., No. 07-1775, 2008 WL 1827637, at *3 (C.D. Cal. Apr. 22, 2008); Wesley v. Hollis, No. 03-3130, 2007 WL 1655483, at *5 (E.D. Pa. June 6, 2007); Oriakhi v. Wood, No. 05-53, 2006 WL 859543, at *5 (M.D. Pa. Mar. 31, 2006).  These courts have generally ruled that the speech in question addressed simply "personal" matters and, as a result, did not qualify for constitutional protection.  See McElroy, 403 F.3d at 858 (inmate's inquiries about whether he and colleagues in prison sewing shop would receive "lay-in pay" upon its closure); Chambers, 2000 WL 1459836, at *2 (inmate's suggestion that another inmate should be hired to work with him

as a prison law clerk); <u>Ruiz</u>, 2008 WL 1827637, at *3 (inmate's complaints about changes to work assignments in prison laundry).

Like the speech in these cases, Cossette's written statement that Belton "followed all print procedures" when Poulin allegedly overcharged him dealt with a "matter of purely individual economic importance," rather than a matter of public concern. <u>McElroy</u>, 403 F.3d at 858 (internal quotation marks omitted). Cossette did not say, for example, that the alleged overcharging was an example of Poulin's regular attempts to enrich herself by defrauding the inmates, which could at least arguably "relate[] to issues affecting [all] prisoners" and be "designed to effect a change in prison policy." <u>Pearson v. Welborn</u>, 471 F.3d 732, 741 (7th Cir. 2006) (ruling that inmate's complaints about conditions in particular prison unit, including lack of yard time and use of shackles during group therapy, raised matter of public concern capable of supporting retaliation claim); <u>see also</u> <u>King v. Ditter</u>, 432 F. Supp. 2d 813, 818 (W.D. Wis. 2006) (ruling that inmate's complaints that prison shop had imposed illegal work schedule and engaged in racism were protected by the First Amendment, but that his complaint about his own reduced pay was not). In the absence of such broader significance, Cossette's claim that Belton adhered to print procedures cannot be "fairly

considered as relating to any matter of political, social, or other concern to the community." <u>Connick</u>, 461 U.S. at 146.

Some courts have shied away from deciding whether the public concern limitation on the free speech rights of public employees applies to inmates at all, <u>see</u>, <u>e.g.</u>, <u>Thaddeus-X</u>, 175 F.3d at 391-92; <u>Banks v. York</u>, 515 F. Supp. 2d 89, 112-13 (D.D.C. 2007); <u>Teahan v. Wilhelm</u>, No. 06-15, 2007 WL 5041440, at *10 (S.D. Cal. Dec. 21, 2007), <u>rept. & rec. adopted in part</u>, 2008 WL 877842 (S.D. Cal. Mar. 28, 2008), and at least one court has done so only with reservations, <u>see</u> <u>Watkins v. Kasper</u>, No. 05-28, 2008 WL 2357679, at *9-*13 (N.D. Ind. June 6, 2008) (following <u>McElroy</u>). But none of these cases offers any good reason why inmate employees should enjoy greater constitutional protection from retaliatory actions than their nonincarcerated counterparts do, and none is apparent to this court.

<u>Watkins</u> expressed doubt over "put[ting] prisoner employees on similar legal footing to public employees" because "prisoner employees and public employees are not similarly situated."[3]

_____

[3]<u>Watkins</u>, attempting to reconcile what it perceived as conflicting Seventh Circuit precedent in this area, observed, "[i]t could be that the public concern requirement only applies when retaliation occurs in response to an inmate's speech during his prison employment."  2008 WL 2357679, at *13.  While some courts have applied the public concern limitation to inmates' retaliation claims unrelated to their prison jobs, <u>see</u>, <u>e.g.</u>, <u>Wesley</u>, 2007 WL 1655483, at *5, this court need not decide

2008 WL 2357679, at *13.  That is true, but principally in the
sense that the prison employment context necessitates--and
therefore tolerates--<u>greater</u> restraints on employees' First
Amendment rights than the public employment context does.
Indeed, as the <u>Thaddeus-X</u> court noted, "[p]risoners may be
required to tolerate more than public employees, who may be
required to tolerate more than average citizens," when it comes
to abridgement of First Amendment rights.  175 F.3d at 398; <u>see
also</u> <u>Turner v. Safley</u>, 482 U.S. 78, 89-90 (1987) (declining to
give prisoner speech same protections as non-prisoner speech).

    In either case, though, the rationale for the public concern
limitation holds:  "arriving 'at a balance between the interests
of the [employee], as a citizen, in commenting upon matters of
public concern and the interest of the State, as an employer, in
promoting the efficiency of the public services it performs
through its employees.'"  <u>Connick</u>, 461 U.S. at 140 (quoting
<u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968)).  Indeed, as
one court recently observed in summarizing the Supreme Court's

---

whether the limitation applies in that context because, here, the
alleged retaliation occurred in the course of Cossette's
employment.  Thus, the <u>Watkins</u> court's concern that "[i]n the
prison context, retaliation can take the form of greater
restrictions on liberty," <u>e.g.</u>, "false conduct reports, or
harsher conditions of confinement"--necessitating, in that
court's view, broadening the scope of protected activity, 2008 WL
2357679, at *13--is not implicated here.

guidance in this area, the limitation applies "in situations
analogous to public employment, where free speech rights must be
balanced against the need to effectively manage a governmental
entity." Jenkins v. Rock Hill Local Sch. Dist., 513 F.3d 580,
586 (6th Cir.), cert. denied, 128 S. Ct. 2445 (2008). There can
be no doubt that prisons are among those government entities to
which effective management is vitally important. See, e.g.,
Turner, 482 U.S. at 89.

Thaddeus-X, the only other decision to discuss in detail
applying the public concern limitation in the prison context,
does so in the context of holding that the limitation does not
restrict inmate claims of retaliation for exercising their First
Amendment petition rights, viz., their right of access to the
courts, rather than their free speech rights; the court reasoned
that, because inmate lawsuits encompassed by the petition right
inevitably raise personal concerns, applying the public concern
limitation in that context would essentially give prison
authorities free rein to retaliate against inmates for
constitutionally protected court filings. 175 F.3d at 392; see
also Friedl v. City of N.Y., 210 F.3d 79, 87 (2d Cir. 2000).
Whatever the legitimacy of that concern, it is not implicated
here, because Cossette alleges retaliation for exercising his

14

right to free speech, not his right of access to the courts.[4]

Belton, not Cossette, was the one preparing to take legal action.

The fact that Cossette spoke in an effort to assist Belton in

exercising his own asserted right of access does not transform

Cossette's speech claim into a petition claim.[5]  See Shaw v.

Murphy, 532 U.S. 223, 230 (2001) (holding that communications of

legal advice enjoy no greater First Amendment protection than

other speech between inmates).  Moreover, Cossette acknowledged

---

[4]It is worth noting, though, that the First Circuit has held
that the public concern limitation also applies to claims of
retaliation for exercising the right to petition, at least in the
case of public employees.  Boyle v. Burke, 925 F.2d 497, 505 (1st
Cir. 1991) ("absolute First Amendment protection is not accorded
to any grievance a public employee files against an employer,
without regard to content"); but see Rosado-Quiñones v. Toledo,
528 F.3d 1, 8 (1st Cir. 2008) (Torruella, J., dissenting)
(arguing that the public concern limitation should not restrict
an employee's claim based on retaliation for the petition right).

[5]The First Circuit has held that one inmate has standing to
assert a claim arising out of retaliation for helping another
inmate exercise his right of access to the courts.  McDonald, 610
F.2d at 19 (citing Johnson v. Avery, 393 U.S. 483 (1969)).
Putting aside the question of whether this holding survives the
Supreme Court's subsequent decision in Lewis v. Casey, 518 U.S.
343, 349 (1996), which affirmed that an inmate "must show actual
injury" to maintain a claim for denial of the right of access to
the courts, the protected conduct at issue in McDonald was "legal
assistance," 610 F.2d at 17, of the kind contemplated by the
Supreme Court in Johnson, 393 U.S. at 488-90 (discussing inmates'
need for legal counsel in preparing habeas petitions).  Cossette,
however, does not claim retaliation for providing legal
assistance to Belton, but for offering testimony in support of
"legal proceedings" that Belton intended to pursue solely through
his own efforts.

at oral argument that he was claiming retaliation based solely on the exercise of his right to speak.

Nor does the fact that Cossette spoke in anticipation of testifying during Belton's planned "legal proceedings" against Poulin automatically imbue the speech with First Amendment protection in the way Cossette argues.  See Pettus v. McGinnis, 533 F. Supp. 2d 337, 340 (W.D.N.Y. 2008) (finding no authority that "an inmate's testimony on behalf of another inmate . . . is constitutionally protected") (emphasis omitted).  Though the First Circuit has yet to address the question, the majority of the federal courts of appeals have declined to adopt a per se rule that a public employee's testimony qualifies as protected speech regardless of the topic, applying some "public concern" limitation even in that context.  See Kirby v. City of Elizabeth City, 388 F.3d 440, 446-47 (4th Cir. 2004); Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 927 n.6 (9th Cir. 2004); Catletti ex rel. Est. of Catletti v. Rampe, 334 F.3d 225, 229-30 (2d Cir. 2003); Worrell v. Henry, 219 F.3d 1197, 1205 (10th Cir. 2000); Maggio v. Sipple, 211 F.3d 1346, 1352-54 (11th Cir. 2000); Padilla v. S. Harrison R-II Sch. Dist., 181 F.3d 992, 996-97 (8th Cir. 1999); Wright v. Ill. Dep't of Children & Family Servs., 40 F.3d 1492, 1505 (7th Cir. 1994); but see Green v. Phila. Hous.

16

<u>Auth.</u>, 105 F.3d 882, 887 (3d Cir. 1997);[6] <u>Johnston v. Harris County Flood Control Dist.</u>, 869 F.2d 1565, 1578 (5th Cir. 1989).

Furthermore, the circuit cases on which Cossette relies in support of an absolute "right to testify" do not support that view.  While the Second Circuit, in <u>Franco v. Kelly</u>, 854 F.2d 584 (2d Cir. 1988), recognized an inmate's claim of retaliation for "cooperation with a state administrative investigation of alleged incidents of inmate abuse at the prison," it held that this activity "implicate[d] his broader right to petition government for redress of grievances," rather than his right to speak, <u>id.</u> at 589--which, as just discussed, is the right at issue here.[7]

_____

[6]The court in <u>Green</u> rejected any distinction between testimony compelled by a subpoena and testimony given voluntarily for purposes of applying the public concern limitation, holding that it was satisfied in either case by the importance of the testimony to the integrity of the judicial process.  105 F.3d at 886.  Because Cossette gave the statement to Belton voluntarily, this court need not consider whether such a distinction should be drawn; it is enough to reject <u>Green</u>'s view that testimony is per se speech on a matter of public concern no matter what.  Thus, Cossette's point at oral argument about retaliation against an inmate who testifies in response to a subpoena, while interesting, is merely hypothetical in this case.

[7]Insofar as <u>Franco</u> could be read as based on the plaintiff's right to free speech, it "involved grievances that were aired in connection with a New York State investigation into alleged incidents of inmate abuse by guards at the Attica Correctional Facility, clearly a matter of public concern." <u>Sussman v. N.Y. City Health & Hosps. Corp.</u>, No. 94-8461, 1997 WL 334964, at *8 n.4 (S.D.N.Y. June 16, 1999) (distinguishing <u>Franco</u>).  So <u>Franco</u> does not fairly support the proposition that inmates are protected from retaliation for their speech, whatever the topic.

The Tenth Circuit's unpublished opinion in <u>Zarska v.
Higgins</u>, 171 Fed. Appx. 255 (10th Cir. 2006), did reverse the
dismissal of an inmate's claim of retaliation for providing
another inmate with an affidavit supporting his claim of threats
by a guard, <u>id.</u> at 257, but did so without any discussion of
whether the affidavit constituted protected activity.  This is
unsurprising because (1) the district court had dismissed the
claim on entirely different grounds and (2) the retaliation took
the form of a disciplinary charge, rather than any action adverse
to the plaintiff's employment, which makes the public concern
limitation inapplicable, at least in the case of non-prisoner
claims, <u>see</u> <u>Campagna v. Mass. Dep't of Envtl. Prot.</u>, 334 F.3d
150, 154-55 (1st Cir. 2003) (refusing to apply public concern
limitation where plaintiff, though a public employee, alleged
retaliation in the form of injury to his private business
interests, rather than action adverse to his public employment).
<u>Zarska</u>, like <u>Franco</u>, is inapposite.[8]

Eschewing any per se First Amendment protection for
testimony is in keeping with the First Circuit's traditional

---

[8]The other two Tenth Circuit cases on which Cossette relies
are similarly unavailing; while, in both cases, the speech at
issue included testimony, in each the court specifically ruled
that the testimony was on a matter of public concern.  <u>Langley v.
Adams County</u>, 987 F.2d 1473, 1479 (10th Cir. 1993); <u>Melton v.
City of Okla. City</u>, 879 F.2d 706, 713-14 (10th Cir. 1989).

reluctance to treat particular types of speech as categorically raising matters of public concern.  <u>See</u> <u>Davignon v. Hodgson</u>, 524 F.3d 91, 101 (1st Cir. 2008) (declining to treat speech related to union activity as on a "matter of 'inherent public concern'"); <u>Fabiano v. Hopkins</u>, 352 F.3d 447, 454 (1st Cir. 2003) (declining to treat lawsuit involving zoning as "inherently a matter of public concern").  This reluctance reflects a worry over creating a jurisprudence that "would sweep nearly every public act under First Amendment protection."  <u>Fabiano</u>, 352 F.3d at 454.  So, with a few, narrow exceptions, the First Circuit has engaged in "a case-specific, fact-dependent inquiry" into "the content, form, and context of a given statement as revealed by the whole record" to discern whether it addresses a matter of public concern. <u>Davignon</u>, 524 F.3d at 101.

This court concludes, in line with circuit precedent, that this inquiry is necessary even when the speech is testimonial in nature and that, as discussed <u>supra</u>, the content, form, and context of Cossette's written statement to Belton show that it did not deal with a matter of public concern, but was "personal in nature and not related to [the prison's] broader policies." <u>Id.</u> at 102 (citing <u>Saulpaugh v. Monroe Cmty. Hosp.</u>, 4 F.3d 134, 143 (2d Cir. 2002)); <u>see also</u> <u>Wallace v. Sch. Bd.</u>, 41 F. Supp. 2d 1321, 1326-27 (M.D. Fla. 1998) (ruling that employee had not

spoken on matter of public concern by giving written statements

to coworker in support of his suit against their employer).[9]

Because Cossette was not engaged in activity protected by

the First Amendment when he provided Belton with the written

statement attesting to his adherence to proper print procedures

in the prison library, his retaliation claim fails.   The

defendants are entitled to summary judgment.[10]

_____

[9]The court does not suggest that an inmate is never speaking
on a matter of public concern when he offers testimony in support
of another inmate's complaint, see, e.g., Catletti, 334 F.3d at
230 (ruling that, in testifying at trial in support of
whistleblower action by prison nurses, prison administrator had
spoken on a matter of public concern, "[t]he quality of mental
health services provided in the County prison"), simply that such
speech is not per se protected by the First Amendment regardless
of the nature of the complaint or the testimony.   Thus, this
court agrees with Gay v. Shannon, No. 02-4693, 2005 WL 756731, at
*8-*9 (E.D. Pa. Mar. 1, 2005), aff'd, 211 Fed. Appx. 113 (3d Cir.
2006) (unpublished disposition), insofar as it rejects the view
that an inmate never can claim retaliation for testifying as a
non-party witness.   But that decision also does not stand for the
equally categorical proposition that an inmate always can make
that claim, regardless of the subject of the testimony; indeed,
the Third Circuit noted in affirming the Gay decision that the
defendant "did not dispute that [the inmate] engaged in protected
activity" by testifying.   211 Fed. Appx. at 117.   This court also
recognizes that there may be "'legitimate penological interests'"
that support restrictions on an inmate's testimony, even when it
does deal with a matter of public concern, Gay, 2005 WL 756731,
at *9, but need not consider that issue here because the
defendants have not raised it.

[10]Since Cossette has no constitutional claim against Poulin
for transferring him, it follows that he also has no
constitutional claim against Cox and Crompton for affirming that
decision.   See Rivera v. Rhode Island, 402 F.3d 27, 38-39 (1st
Cir. 2005).

## IV.   <u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment (document no. 13) is GRANTED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 28, 2008

cc:  Tom Cossette, pro se
     Deborah B. Weissbard, Esq.